UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL BOWEN,

    Plaintiff,                               Civil Action No. 06-14964

v.                                             HON. SEAN F. COX
                                               U.S. District Judge
                                               HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Daniel Bowen brings this action pursuant to 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for disability and disability insurance benefits under the Social Security Act (Tr. 41-43). Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On March 6, 2003 Plaintiff filed an application for Disability Insurance Benefits (DIB), alleging an onset of disability date of January 31, 2000 (Tr. 43-45). After denial of his initial claim, Plaintiff filed a timely request for an administrative hearing, conducted on July 6, 2005 in Oak Park, Michigan before Administrative Law Judge ("ALJ") Henry Perez (Tr. 245). Plaintiff, represented by attorney Melissa Gries, testified, as did vocational expert ("VE") Michael Rosco, Ph.D (Tr. 247-256, 256-262). On December 12, 2005, ALJ Perez

found that although Plaintiff was unable to perform his past relevant work, he retained the ability to perform a significant range of other work at all exertional levels (Tr. 21-22). On September 1, 2006 the Appeals Council denied review (Tr. 4-6). Plaintiff filed for judicial review of the final decision on November 3, 2006.

## BACKGROUND FACTS

Plaintiff, born April 5, 1949, was age 56 when the ALJ issued his decision (Tr. 43). He completed two years of college and worked previously as a tool engineer for Chrysler Corporation (Tr. 48, 53). Plaintiff alleges an onset date of January 31, 2000 as a result of combat wounds sustained in March, 1970 in Vietnam, and Post Traumatic Stress Disorder ("PTSD") (Tr. 47).

### A. Plaintiff's Testimony

Plaintiff testified that he had received over 100 credits toward the completion of a Bachelor's Degree in maintenance technology (Tr. 248). Plaintiff reported that he worked at his most recent job from 1983 until his retirement on January 31, 2000 (Tr. 248). Plaintiff attributed his retirement to "social problems" with his daughter and grandchildren, along with post-traumatic stress as a result of March 1970 combat injuries (Tr. 249). Plaintiff reported that since retiring, the Veteran's Administration ("VA") found him "100 percent disabled" as a result of PTSD (Tr. 249). Plaintiff, right handed, testified that he received vocational training after returning from Vietnam and became a journeyman toolmaker (Tr. 250). He reported that his job duties, which consisted mainly of directing apprentices, did not require heavy lifting or prolonged standing (Tr. 250). Plaintiff added that he was unable to stand for long periods due to an early 1990s motorcycle injury (Tr. 251).

Plaintiff reported taking medication to stay "functional," stating that while on medication, he was capable of appropriate social interaction, unless dealing with "complete

idiots" (Tr. 251). He testified that he experienced "good" and "bad" days, indicating that on bad days, he became depressed, slept, and tried to avoid other people (Tr. 252). He stated that he continued to receive anger management counseling and medication though a VA program, indicating that PTSD factored into his decision to retire (Tr. 252). Plaintiff opined that he would be unable to return to his previous job without medication, adding that he was uncertain as to whether he could perform his former job while under the influence of medication (Tr. 253). He stated that his stress was exacerbated by his grandson's problems (Tr. 253).

Plaintiff estimated that he could lift up to 25 pounds occasionally, stand for up to four hours, and sit for unlimited periods, but was unable to walk more than "few blocks" without leg problems (Tr. 254-255).

### B. Medical Evidence
#### i. Treating Sources

In November 2001, Plaintiff reported to Psychiatrist Magdalena S. Beltran that his medication was helping him "a lot" (Tr. 145). Dr. Beltran noted that Plaintiff was "pleasant and cooperative," and demonstrated a "full range of affective expression" (Tr. 145).

In January 2002, a colonoscopy showed the presence of hemorrhoids (Tr. 101). In February 2002, Plaintiff underwent ultrasounds of the kidneys and pelvis, showing normal results (Tr. 116). Carl M. Karoub, M.D., noted that a stress test produced normal results (Tr. 116). Also in February 2002, Plaintiff indicated that he was "trying to cut down" on his marijuana use (Tr. 144). Treating notes show that he exhibited appropriate behavior at his examination (Tr. 144). Dr. Beltran recorded that Plaintiff's thinking was "logical, coherent and goal directed" (Tr. 144). The next month, Plaintiff reported stress as a result of his

wife's health problems, adding that he was trying to cut down his marijuana use to "six joints/day" (Tr. 143). July 2002 treating notes indicate that Plaintiff was appropriately groomed with "normal thought content," but appeared anxious (Tr. 140). Plaintiff reported in September 2002 that he was attempting to limit his marijuana use to "3 joints/day" (Tr. 137). Plaintiff also reported normal sleeping patterns and that his prescription for Depakote "lessened his temper behavior" (Tr. 137). In November 2002, he indicated that he had enrolled in a substance abuse program to cut his marijuana use (Tr. 134).

The same month, Elaine M. Tripi Ph.D., C.R.C., performed a "Psycholsocial Assessment and Employability Evaluation" of Plaintiff (Tr. 117). Dr. Tripi noted that Plaintiff stopped using alcohol in 1984 but continued to use marijuana (Tr. 117). She categorized Plaintiff's past work as a "troubleshooter in the tool engineering department" as skilled and exertionally light (Tr. 117). Dr. Tripi noted that Plaintiff had received mental health treatment with Dr. Beltrain for several years and had recently begun treatment with Dr. Terlep, adding that Plaintiff had enrolled in an anger management class (Tr. 117). Dr. Tripi reported further that Plaintiff currently took Divalproex and Clonozapam (Tr. 117). She concluded, based on Plaintiff's diagnosis of PTSD and her "interview and observations," that Plaintiff was not "able to sustain substantial, gainful work activity at any skill or exertional level" (Tr. 118). She assigned Plaintiff a GAF of 42[1] (Tr. 120). In December 2002 Geralk Terlep, Ph.D, noting that Plaintiff had entered treatment two months earlier, found that Plaintiff met "severe and serious levels of disability from PTSD in his social and occupational functioning levels," deeming Plaintiff "currently unemployable" (Tr. 240). Dr.

---

[1] A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision*, 34 (*DSM-IV-TR* ) (4th ed.2000).

Terlep assigned Plaintiff a GAF of 41 (Tr. 240).

January 2003 mental health treatment examination notes show that Plaintiff exhibited a "calm" effect (Tr. 132). In March 2003, Plaintiff filed for an increase in his VA disability claim (Tr. 127). Treating notes state that Plaintiff retired from his job at Chrysler in 2000 and was currently supported by a Chrysler pension and a 60 percent "service-connected VA disability" which gave him a combined income of $3,800 each month (Tr. 127). Plaintiff reported that he had been suspended from his Chrysler position on numerous occasions for "drinking on the job," also reporting "multiple legal entanglements and drunken driving arrests" (Tr. 127-128). Claiming a lifelong history of depression and anxiety, Plaintiff indicated that his last psychiatric admission occurred in the 1970's (Tr. 128). Plaintiff reported "no current legal entanglement[s]," or drunken driving arrests since 1990, adding that he had been "completely sober" since 1990 (Tr. 128).

In April 2003, Dr. Beltram noted that Plaintiff continued to use marijuana, but exhibited "normal thought processes" (Tr. 149). Plaintiff claimed that he was still unable to hold a job (Tr. 149). The following month, Plaintiff was treated for periodontal disease (Tr. 150-151). In June 2003, Plaintiff reported interrupted sleep, but stated that he woke up feeling "good" (Tr. 152). In August 2003, Plaintiff again reported that he was unable to hold a job, but denied suicidal thoughts, plans or intents (Tr. 161). The same month, Plaintiff received podiatry care for foot discomfort (Tr. 162). In October 2003, Plaintiff received custom orthotics with half-inch heel lifts (Tr. 174). The same month, Plaintiff reported improved anger management, but indicated stress as a result of conflicts between his wife and grandson (Tr. 174).

On October 21, 2003, the Department of Veterans Affairs found Plaintiff 100 percent disabled as a result of PTSD as of August 7, 2000 (Tr. 37). On October 24, 2003, Plaintiff

alleged difficulty remembering words and names, as well as difficulty performing routine tasks (Tr. 177). Treating notes state that Plaintiff exhibited "5/5 strength throughout" with normal muscle tone (Tr. 177). The notes conclude by stating that "[t]here is nothing to suggest a neurodegenerative process" (Tr. 178). A CT scan performed on Plaintiff's brain in December 2003 found no abnormalities (Tr. 180). August 2004 treating notes indicate that Plaintiff was volunteering his time at the VA medical clinic on a weekly basis (Tr. 195). The same notes found Plaintiff "alert" and "verbal" with judgment intact (Tr. 195). November 2004 and April 2005 treating records indicate that Plaintiff continued to volunteer at the medical center (Tr. 202, 218). Plaintiff denied depression at a January 2005 screening (Tr. 211).

### ii. Consultive Sources and Non-Examining Sources

In June 2003, Bruce G. Douglass, Ph.D., performed a Psychiatric Review Technique of Plaintiff's treating records, finding the presence of anxiety-related and substance addiction disorders (Tr. 83-94). The evaluation found the presence of *mild* limitations in activities of daily living as well as *moderate* difficulties in maintaining social functioning and maintaining concentration, persistence, or pace (Tr. 93).

A Mental Residual Functional Capacity Assessment performed on the same day by Dr. Douglass found Plaintiff's ability to carry out detailed instructions, concentrate for extended periods, work within a schedule, complete a workweek without interruptions from psychologically based symptoms, interact appropriately with the general public, and get along with coworkers was *moderately* limited, but otherwise found an absence of significant impairments (Tr. 97). Dr. Douglass concluded that although Plaintiff would not "work well with the general public due to anger problems," his cognitive abilities were intact, allowing him to perform simple tasks on a sustained basis (Tr. 99).

### C. Vocational Expert Testimony

VE Michael Rosco classified Plaintiff's former work as skilled at the light level of exertion (Tr. 257). He characterized Plaintiff as an individual "closely approaching advanced age," and "only two credits short of having his Bachelor's Degree" (Tr. 257). The VE found that Plaintiff skills in machine shop practices and blueprint reading were transferrable to exertionally medium work (Tr. 259). The ALJ then posed the following question to the VE:

> "Taking claimant's age, education, work experience into account. Assume that such a person has no exertional limitations of lifting established. We impose limitations on jobs that would provide for routine production and stress, and simple job assignments, and occasional contact with the public, co-workers, and supervision. And if we put this individual at the unskilled level, could such a person be expected to perform claimant's past relevant work?"

(Tr. 259). The VE stated that given the above limitations, such an individual would be unable to perform Plaintiff's past work (Tr. 259). The VE then testified that such an individual could perform the unskilled, exertionally medium work of a janitor, machine tender, assembly worker, packager, sorter, and inspector, stating that approximately 50,000 such jobs existed in the regional economy (Tr. 260). The VE added that the above jobs could be modified to include only exertionally light work with the exception of approximately 6,000 of the janitorial positions (Tr. 250). He indicated that if Plaintiff's claims of non-exertional limitations were fully credited he would be unable to perform any work due to "personal and post-traumatic factors" along with depression and social limitations (Tr. 261). He testified that his findings were consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 261).

### D. The ALJ's Decision

ALJ Perez concluded that although Plaintiff was unable to perform his past relevant work, he could perform unskilled work at all exertional levels (Tr. 20-22). Citing Plaintiff's medical records, he found that Plaintiff experienced PTSD, an adjustment disorder, cannabis

dependence, and a history of ETOH [alcohol], cocaine, and heroin substance abuse in remission (Tr. 18, 21). The ALJ determined that these impairments were "severe" based on the requirements of 20 C.F.R. § 404.1521, but found that they did not meet or medically equal one of the impairments found in Part 404 Appendix 1 Subpart P, Regulations No. 4 (Tr. 18, 21).

The ALJ found that Plaintiff retained the physical residual functional capacity ("RFC") to perform a significant range of work at all exertional levels," finding further that Plaintiff's *mental* RFC allowed him "to perform unskilled work with simple job assignments, routine production and stress and occasional contact with the public, co-workers, and supervisors" (Tr. 20). The ALJ found that Plaintiff could perform the exertionally medium work of a janitor, packer, or loader (Tr. 22).

The ALJ found Plaintiff's allegations of limitations "out of proportion to the objective evidence," noting his history of conservative treatment (Tr. 18). The ALJ also observed that Plaintiff had assumed "ongoing responsibility" for the care of his teenaged grandson and performed volunteer work, indicating that "his social functioning is not as limited as he purports" (Tr. 19).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of

review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

### A. Credibility

Plaintiff contends first that the ALJ erred in rejecting his allegations of disability as a result of mental problems and medication side effects. *Plaintiff's Brief* at 11-14. He argues that his claimed limitations stand well supported by his wife's Third Party Observation forms and his treating records, submitting further that the ALJ impermissibly cited his sporadic (as opposed to regular) activities to discount his testimony. *Id.*

An ALJ's credibility determination is guided by SSR 96-7p, which further describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986). "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* Second, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record."

As a rule, the courts cede enormous latitude to the ALJ's credibility determinations. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *see also Richardson, supra,* 402 U.S. at 401. An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record.'" *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989); *Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986). However, an ALJ's decision must contain specific reasons for the findings of credibility, supported by substantial evidence in the record. *Howard v. Commissioner of Social Security,* 276 F.3d 235, 242 (6th Cir. 2002); *Heston v. Commissioner of Social Security,* 245 F.3d 528, 536 (6th Cir. 2001).

Here, the ALJ's credibility determination adhered to both the procedural and substantive requirements of SSR 96-7. The ALJ noted that Plaintiff's claim that he was unable to hold a job stood at odds with his "wide range of daily activities," including the care of his teenaged grandson (Tr. 18). The ALJ also noted that Plaintiff worked regularly as a volunteer on behalf of the VA clinic, suggesting that "his social functioning is not as limited as he purports" (Tr. 19).

Additional record evidence supports the ALJ's finding that neither mental illness nor medication side effects rendered Plaintiff disabled. Plaintiff acknowledged that he regularly prepared meals; performed lawn care and household chores; shoveled snow; and performed handyman functions (Tr. 59-60). Plaintiff's own statements indicate further that he was capable of appropriate social interaction, admitting that he continued to drive, shop, and coped with disagreeable individuals by "avoid[ing] them" (Tr. 251). Plaintiff's treating records indicate consistently that he appeared well-dressed and neatly groomed (Tr. 129, 132, 134, 140). Although Plaintiff contends that the ALJ impermissibly discounted his allegations on the basis of only *intermittent* household and social activities, April 2003 treatment notes support the conclusion that Plaintiff *regularly* performed household tasks and engaged in socially appropriate behavior:

> "When asked to discuss what the typical day was like for him, the veteran stated he usually gets up at 7:15 in the morning, gets washed and assists his grandson in getting ready for school, when he goes to a coffee shop and spends time with friends, and does various chores at home including vacuuming, cleaning, and painting when indicated. His hobbies include wood working and his only expressed goals for the future include taking care of his wife and grandson, hoping to put his grandson through college"

(Tr. 129).

Finally, Plaintiff contends that his wife's statement that he did not have close friendships and "at times doesn't seem to want to be around anyone" implies that his mental

-11-

health limitations prevent him from performing any work (Tr. 75). However, again, because substantial evidence - indeed, even a preponderance of evidence - supports the opposite conclusion, the ALJ's credibility determination should be upheld.

### B. Veterans Administration Finding of 100 percent Disability

Plaintiff also faults the ALJ for declining to consider the 2003 VA determination that he was 100 percent disabled in composing a Residual Functional Capacity. *Plaintiff's Brief* at 14-18. While conceding that the Sixth Circuit has not "specifically addressed VA service-connected disabilities," Plaintiff notes that other jurisdictions have determined that a VA determination is entitled to at least "some" weight. *Id.* at 15; *citing Richter v. Chater,* 900 F. Supp. 1531, 1538-1539 (D. Kan. 1995).

Plaintiff notes correctly the dearth of controlling law on this issue. The Sixth Circuit released its most substantive discussion of the effect of a VA finding on an SSA determination thirty-seven years ago: "A finding of the Veterans' Administration that claimant was 100% Disabled while not binding on Secretary of Health, Education and Welfare on application of claimant for disability benefits, was entitled to weight in evaluating claimant's condition." *Jenkins v. Gardner,* 430 F.2d 243, 306 (6th Cir. 1970). This position on the weight appropriately given to a VA finding is likewise summarized in *Williford v. Secretary of Health and Human Services,* 550 F.Supp. 248, 251 (D.C. Ohio,1982): "[W]hile the disability finding of the Veterans Administration or another government agency can be given some weight, it is not dispositive of a social security claim." I find no requirement from the Sixth Circuit that the ALJ must give *great* weight or even modestly augmented weight to the VA's finding, nor must the ALJ discuss the VA finding in his written decision.

However, even assuming that the 2003 VA determination were presumptively entitled to *great* weight, ALJ Perez effectively rebutted this "presumption" by performing a thorough

analysis of the VA finding and detailed reasons for its rejection. The ALJ, noting that the VA determination was premised in large part on the November 2002 report by Dr. Tripi, reasonably discounted Dr. Tripi's findings on the basis that her disability conclusion was based on only one interview and Plaintiff's "subjective complaints" (Tr. 19). ALJ Perez, also noting that Dr. Terlep's opinion had been factored into the VA determination, permissibly discounted his findings because of the absence of treating records supporting his conclusion (Tr. 19). Finally, in addition to his substantive findings, the ALJ correctly noted that pursuant to 20 C.F.R. 404.1504, "the decision made by the Department of Veterans Affairs is not binding upon the Commissioner" (Tr. 19). *See also* SSR 96-8p, fn.8; 20 C.F.R. §404.1527(e)(1) (The ultimate legal conclusion as to whether a plaintiff is disabled or unable to work is reserved to the Commissioner). The ALJ's analysis and rejection of the VA finding does not constitute error.

### C. Vocational Expert Testimony

Finally, Plaintiff argues that the ALJ's hypothetical question to the VE failed to include a portion of his exertional and non-exertional limitations. *Plaintiff's Brief* at 18-19. Citing *Edwards v. Barnhart,* 383 F. Supp. 2d 920 (E.D. Mich. 2005), he contends that the ALJ impermissibly overlooked his moderate concentrational impairments; hand, and lower extremity problems; and limitations as a result of glaucoma, cataracts, and hearing loss (Tr. 18). He submits that the omission of critical impairments tainted the ultimate RFC which found the absence of physical limitations and only moderate problems "interacting with the general public" (Tr. 20).

In *Varley v. Secretary of Health & Human Services,* 820 F.2d at 779, the court held that "[s]ubstantial evidence may be produced through reliance on the testimony of a

vocational expert in response to a hypothetical question, but only if the question accurately portrays plaintiff's individual physical and mental impairments." (internal citations omitted). The ALJ's credibility determination impacts the composition of a hypothetical question. "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994); *Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987).

The ALJ's omission of Plaintiff's alleged physical impairments as listed above does not constitute grounds for remand. First, although Plaintiff alleged disability as a result of combat wounds as well as PTSD, his treating records indicate that he received minimal, if any, treatment in recent years for injuries sustained in 1970[2] (Tr. 47). Moreover, October 2003 treating notes indicate that Plaintiff exhibited "5/5 strength throughout" with normal muscle tone" (Tr. 177).

Next, although Plaintiff was treated for hearing loss and eye problems, none of his treating records indicate that either condition created workplace limitations. A September 2003 audiology exam indicates that Plaintiff was advised to use hearing aids, but nonetheless retained "excellent" bilateral speech recognition (Tr. 167). Significantly, while Plaintiff argues that the presence of severe exertional limitations invalidate the ALJ's contrary conclusion, in fact, Plaintiff's attorney composed her own hypothetical question to the VE at the hearing absent any reference to exertional limitations:

> "A fair ability to follow work rules. Use judgment, maintain attention and concentration, understand, remember, and carry out simple job instructions, maintain personal appearance, and behave in an emotionally stable manner. A poor or no ability to relate to co-workers and deal with the public, work

---

[2]In contrast to the absence of records showing continued physical problems from the1970 combat injuries, Plaintiff sought treatment on numerous occasions for dental work (Tr. 131-133,135,-136, 138-140, 149-151, 153, 158-160, 163).

-14-

> stressors, understand, remember and carry out complex job instructions. Understand, remember and carry out detailed but not complex job instructions. Relate predictably in social situations and demonstrate reliability"

(Tr. 262).

Plaintiff's argument that the ALJ failed to fully acknowledge his mental limitations is equally unavailing. Admittedly, a June 2003 Mental Residual Functional Capacity Assessment by Dr. Douglass found that Plaintiff's ability to carry out detailed instruction, concentrate for extended periods, work within a schedule, complete a workweek without interruptions from psychologically based symptoms, interact appropriately with the general public, and get along with coworkers was *moderately* limited (Tr. 97). However, while *moderate* mental impairments may indicate limitations inconsistent with full time employment (*See, e.g.*, *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996); *McGuire v. Apfel*, 1999 WL 426035, 15 (D. Or. 1999)) here, Dr. Douglass, after finding moderate limitations, stated explicitly that the presence of these impairments did not prevent Plaintiff from performing "simple tasks on a sustained basis" (Tr. 99). Moreover, the fact that the ALJ omitted a verbatim reference to Plaintiff's *moderate* difficulties in maintaining concentration, persistence, or pace as found by Dr. Douglass does not constitute error (Tr. 93). Although the ALJ did not adhere to talismatic language of the Mental Residual Functional Capacity Assessment when referring to Plaintiff's mental limitations in the hypothetical question, this was not required, provided that the question reflected his relevant limitations. *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001).

Even assuming for the sake of argument that the absence of pacing deficiencies from the hypothetical limitations constitutes error as argued by Plaintiff, the ALJ's conclusion that Plaintiff could perform a broad range of jobs at all exertional levels included janitorial

positions (as opposed to jobs with production quotas) which would clearly allow Plaintiff to complete his assignments at his own pace. The error (if one can be assigned) is therefore harmless.

Although treating records suggest that Plaintiff experiences a degree of limitation as a result of emotional problems, the evidence points strongly to a finding of non-disability as defined by the Commissioner. The administrative decision is well within the "zone of choice" accorded to the fact-finder at the administrative level. *Mullen v. Bowen, supra*, 800 F.2d at 545. Accordingly, the ALJ's decision should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages

in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

S/R. Steven Whalen  
R. STEVEN WHALEN  
UNITED STATES MAGISTRATE JUDGE

Dated: November 27, 2007

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 27, 2007.

S/G. Wilson  
Judicial Assistant

In June, 2003, Bruce G. Douglass, Ph.D. performed a Psychiatric Review Technique of Plaintiff's treating records, finding the presence of anxiety-related and substance addiction disorders (Tr. 83-94). The evaluation found the presence of *mild* limitations in activities of daily living as well as *moderate* difficulties in maintaining social functioning and maintaining concentration, persistence, or pace (Tr. 93).

      A Mental Residual Functional Capacity Assessment performed on the same day by Dr. Douglass found Plaintiff's ability to carry out detailed instruction, concentrate for extended periods, working within a schedule, complete a workweek without interruptions from psychologically based symptoms, interact appropriately with the general public, and get along with coworkers was *moderately* limited, but otherwise found an absence of significant impairments (Tr. 97). Dr. Douglass concluded that although Plaintiff would not "work well with the general public due to anger problems," his cognitive abilities were intact, allowing him to perform simple tasks on a sustained basis" (Tr. 99).